**COMMONWEALTH OF PENNSYLVA-
NIA ex rel. Ernest Earl STORCH,
Appellant,**

v.

**James F. MARONEY, Superintendent
State Correctional Institution,
Pittsburgh, Pennsylvania.**

**No. 15473.**

United States Court of Appeals
Third Circuit.

Argued Feb. 21, 1966.

Decided July 7, 1966.

See also, D.C., 231 F.Supp. 385.

Alan Frank, Pittsburgh, Pa., for appellant.

Robert F. Hawk, Asst. Dist. Atty., Butler, Pa. (John H. Brydon, Dist. Atty. of Butler County, Butler, Pa., on the brief), for appellee.

### OPINION

Before HASTIE and SMITH, Circuit Judges, and KIRKPATRICK, District Judge.

HASTIE, Circuit Judge.

The appellant in this habeas corpus proceeding is a state prisoner who is serving a life sentence pursuant to a 1953 conviction as accessory before the fact to the murder of his wife in their home in Butler County, Pennsylvania. He did not appeal from the conviction. However, ten years later he sought habeas corpus in the state courts, Commonwealth ex rel. Storch v. Maroney, 1964, 416 Pa. 55, 204 A.2d 263, and thereafter instituted this action in the United States district court.

The only substantial question on this appeal is whether any constitutional right of the accused was violated by using as evidence at his trial a statement admitting complicity in the crime that he gave to the state police at police headquarters without having the benefit of the advice of counsel and without being informed that he might consult with counsel before and have counsel present during the police interrogation.

The relevant facts as found by the district court after a full hearing and an examination of the trial record are these. On the night of the homicide the accused left work shortly after midnight but did not arrive at his home until about 3 A.M. There he found his wife brutally murdered. He promptly called the police and upon their arrival he talked at length to them. Among other things, he explained his delay in reaching home as caused by trouble with the distributor of his automobile. Shortly thereafter the police examined his car and found that the distributor cap had not recently been removed. Some hours later, at about 10 A.M., the captain of state police who was conducting the investigation asked Storch to go to the police barracks. At his subsequent trial, Storch testified that he went willingly, saying: "I will be glad to cooperate in any way I possibly can."

During the course of the day the police learned that Storch, who was still at the police barracks, had recently drawn unusually large sums from his bank account and that there had been serious discord between him and his wife. While the district court did not make a finding on the matter, these facts and the apparently false explanation of his delay in reaching home caused suspicion to focus upon Storch as a person probably implicated in the homicide. The captain in charge of the investigation, who seems to have been a candid and forthright witness, testified as follows in the court below in answer to a question whether after these suspicious circumstances were discovered, Storch was free to leave police headquarters: "I will admit that he wasn't in my mind free to go, but he wasn't told that he was under arrest."

In any event, at 10 P.M., twelve hours after his arrival at the police barracks, Storch was still there. At that time one of the investigators, Detective Nevin, began talking with Storch, who later said that the officer "acted like a father to me" and "talked nice to me". By 11 P.M. Detective Nevin had persuaded Storch to make a full statement in which he admitted that because of his wife's unbearable behavior he had paid three men $3,500. "to take her out of my life". He also admitted arranging for the men to have access to his home the night of the homicide.

In these circumstances, Storch's detention was continued. Neither he nor the police made any mention of counsel until several days after his confession. In fact, it was about a week after he had confessed when he had his first opportunity to consult with counsel. In the meantime, he had agreed to assist the police in apprehending the actual killers by acting as a decoy. Later, this stratagem was carried out successfully with the knowledge and acquiescence of Storch's counsel.

Ultimately Storch and the actual killers were tried, Storch separately. All were convicted. At trial, his defense was that he had employed the killers merely to frighten his wife but had neither instructed them to use violence nor intended that they do so. However, the jury did not believe him.

Neither at the trial nor in the subsequent collateral attacks upon the conviction in state and federal courts has Storch alleged or testified that his confession was coerced or improperly obtained, except to argue that he was not afforded an opportunity to obtain and consult with counsel before making his statement to the police. The court below concluded that there "is not a scintilla of evidence that the statements admitted into evidence at Storch's trial were coerced or induced by promises or threats".

■ But for Escobedo v. State of Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, and subsequent elaboration of doctrine implicit in that decision, the finding of the court below, with ample justification in the record, that Storch's confession was voluntary would be conclusive against his present claim of denial of constitutional right to a fair trial. Only weeks ago, however, building upon Escobedo, the Supreme Court announced that the introduction in evi-

dence of a confession, obtained from a suspect during police detention without first informing him of his right to counsel and providing an opportunity to consult with counsel, is, without more, a sufficient basis for invalidating a resultant conviction as obtained by unconstitutional means. Miranda v. State of Arizona, decided June 13, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. But even more recently, the rules of the *Miranda* and *Escobedo* cases have been declared to be of prospective application only, leaving attacks upon confession-based convictions which antedated those decisions to be governed by judicial determination, unrestricted by the *Miranda-Escobedo* rules, whether the confession was voluntary. Johnson v. New Jersey, decided June 20, 1966, 384 U.S. 719, 86 S.Ct. 1772. At the same time the Court made it clear that failure to provide the *Miranda-Escobedo* safeguards may have evidentiary value on the issue of voluntariness.[1]

■ Thus tested, the use of Storch's statements as evidence against him does not establish an unconstitutional conviction. Indeed, this case presents nothing to indicate coercion, other than a possible inference from the failure to inform the suspect of his right to counsel, as contrasted with sharply conflicting evidence on this issue in Johnson v. New Jersey, supra, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. Compare our decision concerning the same confessions in United States ex rel. Johnson v. Yeager, 1963, 3 Cir., 327 F.2d 320. While the failure of the police to advise Storch of his right to counsel before questioning him may suggest the possibility of overreaching, this alone is not sufficient to outweigh the affirmative evidence, including Storch's own admission, that his confession was entirely voluntary. The entire record compels the conclusion that "the confession [was] the product of an essentially free and unconstrained choice by its maker". See Culombe v. Connecticut, 1961, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037.

The judgment will be affirmed.

---

1. "[T]he nonretroactivity of * * * [the *Miranda-Escobedo* requirements] will not preclude persons whose trials have already been completed from invoking the same safeguards as part of an involuntariness claim." Johnson v. New Jersey, 384 U.S. at 730, 86 S.Ct. at 1779.